REBECCA K. SMITH
Public Interest Defense Center, P.C.
P.O. Box 7584
Missoula, MT 59807
Tel: (406) 531-8133
Fax: (406) 830-3085
publicdefense@gmail.com
Idaho State Bar #8346

Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

# NORTHERN DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES<br><br>                    Plaintiff,<br>vs.<br><br>JEANNE HIGGINS, Idaho Panhandle National Forest Supervisor, and UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture.<br><br>                    Defendants. | Case No: 2:19-cv-332-___<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

# I.  INTRODUCTION

1.   This is a civil action for judicial review under the Administrative Procedure
Act of the U.S. Forest Service's October 11, 2018 Decision Memo approving
the Hanna Flats ("Project") on the Idaho Panhandle National Forest.

2.   Plaintiff Alliance for the Wild Rockies attests that the final decision
approving the Project is arbitrary and capricious, an abuse of discretion,
and/or otherwise not in accordance with law.

3.   Defendants' actions or omissions violate the National Environmental Policy
Act (NEPA), 42 U.S.C.  §§ 4331 et seq., the National Forest Management
Act (NFMA), 16 U.S.C. §§ 1600 et seq., the Healthy Forest Restoration Act,
16 U.S.C.  §§ 6501 et seq., and the Administrative Procedure Act (APA), 5
U.S.C. §§ 701 et seq.

4.   Plaintiff requests that the Court set aside the Project decision pursuant to 5
U.S.C. § 706 and enjoin implementation of the Project.

5.   Plaintiff seeks a declaratory judgment, injunctive relief, the award of costs
and expenses of suit, including attorney and expert witness fees pursuant to
the Equal Access to Justice Act, 28 U.S.C. § 2412, and such other relief as
this Court deems just and proper.

1

## II.  JURISDICTION

6.      This action arises under the laws of the United States and involves the United

States as a Defendant. Therefore, this Court has subject matter jurisdiction

over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331,

1346.

7.      An actual controversy exists between Plaintiff and Defendants.  Plaintiff's

members use and enjoy the Idaho Panhandle National Forest, including the

Hanna Flats Project Area, for hiking, fishing, hunting, camping,

photographing scenery and wildlife, and engaging in other vocational,

scientific, spiritual, and recreational activities. Plaintiff's members intend to

continue to use and enjoy the area frequently and on an ongoing basis in the

future.

8.      The aesthetic, recreational, scientific, spiritual, and educational interests of

Plaintiff's members and staff have been and will be adversely affected and

irreparably injured if Defendants implement the Project.  These are actual,

concrete injuries caused by Defendants' failure to comply with mandatory

duties under NFMA, NEPA, HFRA, and the APA. The requested relief would

redress these injuries and this Court has the authority to grant Plaintiff's

requested relief under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. §§ 705 &

2

706.

9.    Plaintiff submitted scoping comments on the Project.  The Forest Service

categorically excluded this Project from an environmental assessment or

environmental impact statement and stated that the decision is not subject to

an administrative review process.  Therefore, Plaintiff exhausted available

administrative remedies.  Defendant's Decision Memo was the final

administrative action of the U.S. Department of Agriculture Forest Service.

Thus, the Court has jurisdiction to review Plaintiff's APA claims.

### III.  VENUE

10.    Venue in this case is proper under 28 U.S.C. § 1391(e) and Local Civil Rule

3.1.  The Project is located in Bonner County, so venue is proper in the

Northern Division of the District of Idaho.  Additionally, Defendant Higgins

signed the Decision Memo approving the Project, and her office is located in

Kootenai County, also within the Northern Division of the District of Idaho.

### IV.  PARTIES

11.    Plaintiff ALLIANCE FOR THE WILD ROCKIES is a tax-exempt, non-profit

public interest organization dedicated to the protection and preservation of the

native biodiversity of the Northern Rockies Bioregion, its native plant, fish,

and animal life, and its naturally functioning ecosystems.  Its registered office

is located in Missoula, Montana. The Alliance has over 2,000 individual members.  Members of the Alliance observe, enjoy, and appreciate the Northern Rockies' native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Project area in the Idaho Panhandle National Forest.  Alliance's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems by approving the challenged Project.  Alliance for the Wild Rockies brings this action on its own behalf and on behalf of its adversely affected members.

12.  Defendant JEANNE HIGGINS is the Forest Supervisor for the Idaho Panhandle National Forest. In that capacity, she is the official responsible for issuing the Decision Memo that authorized the Hanna Flats Project, and she is responsible for ensuring that the Project is in compliance with NEPA, NFMA, HFRA, and APA.

13.  Defendant UNITED STATES FOREST SERVICE (Forest Service) is an administrative agency within the U.S. Department of Agriculture, and is responsible for the lawful management of our National Forests, including the Idaho Panhandle National Forest.

## V.  FACTUAL ALLEGATIONS

PROJECT STATUS

14. On October 11, 2018, Defendant Higgins signed a Decision Memo authorizing the Hanna Flats logging project on the Idaho Panhandle National Forest.

15. Project activities have not yet commenced, and no timber sale has been awarded yet.

16. The Forest Service has informed the public that the Project timber sales will be advertised for bids in September 2019.

17. The Forest Service estimates that the Project will likely take 5-10 years to implement.

PROJECT AREA

18. The Project area is located on the Priest Lake Ranger District of the Idaho Panhandle National Forests and is approximately 25 miles north of the town of Priest River, Idaho.

19. The Project lies within the Priest Geographic Area.

20. The Priest Geographic Area is located in Boundary and Bonner counties in Idaho and Pend Oreille County in Washington.

21. British Columbia borders the Priest Geographic Area on the north.

5

22.    Physically, the Priest Geographic Area forms a large bowl with the high

elevation Priest/Pend Oreille Divide on the west, and the high elevation

Selkirk Mountains on the east with the two ranges joining near the Canadian

border.

23.    This bowl-shaped topography, with high ridges on three sides, captures cold

air in the low elevations and traps cool moist air in the summer.  As a result,

the low elevation winter snow pack is deeper and more persistent than

elsewhere in northern Idaho, and summertime conditions are relatively moist

and cool compared to neighboring areas. A summer maritime storm track that

dips down from Canada also contributes to favorable growing season

moisture conditions.

24.    This topography and moisture setting is likely part of the reason why upper

Priest River contains the largest contiguous area of old growth cedar,

hemlock, and grand fir in the interior western United States and the largest

concentration of ancient cedar stands in northern Idaho.

25.    There are approximately 71 miles of roads in the 10.6 square mile Hanna

Flats Project area. This yields a road density of approximately 6.7 miles per

square mile.

PROJECT DETAILS

26.    The Project includes 1,843 acres of commercial logging, 360 acres of

precommercial logging, and 149 acres of prescribed burning only.

27.    Approximately 1,109 acres of the commercial logging is "regeneration

harvest," which means clear-cutting or modified clear-cutting.

28.    The Project also includes temporary road construction, excavated skid trail

construction, and road maintenance.

29.    There are also approximately 16.6 miles of unauthorized roads receiving

illegal motorized use in the Project area and the Decision Memo states that

"[t]hese roads will be barricaded to eliminate the illegal use."

GRIZZLY BEAR

30.    The Project is immediately adjacent to the Selkirk Grizzly Bear Recovery

Zone and lies within the Priest Bears Outside Recovery Zone (BORZ) area in

northern Idaho.

31.    The Selkirk grizzly population is listed as threatened under the ESA.

32.    The population is very small (less than 100 bears), and its Recovery Zone is

small and partially isolated.

33.    The population is failing its recovery targets and goals for human-caused

mortality of all bears, human-caused mortality of female bears, and

distribution of female bears with cubs.

34.    The grizzly habitat in the Priest BORZ area is degraded by roads.

35.    Even National Forest roads that are not lawfully "open" to the public are

being illegally used by members of the public.

36.     The Forest Service discloses: "Surveys indicated that some roads within the

Hanna Flats GNA Project Area are being driven with motorized vehicles

despite the fact that they are not listed as open or seasonal roads on the IPNF

BORZ layer (unauthorized use) (Table 8 and Figure 3)."

37.     Table 8 of the Project Biological Assessment is titled "Roads that are not

listed as open on the IPNF BORZ layer that are being illegally used" and

indicates that the Forest Service found 16.63 miles of illegal road use in the

Project area alone.

38.     The Project Decision Memo states that the Forest Service will "[e]liminate

illegal motorized use on roads after project" for these 16.6 miles.

39.     In the meantime, illegal road use continues.

40.     The Forest Service states: "The action area for this project will be the Priest

Bears Outside Recovery Zone (BORZ) area. This area was selected because

it will encompass all direct and indirect effects of the proposed project."

41.     The Forest Service does not disclose how many miles of illegal road use are

occurring outside the Project area but still within the Priest BORZ area.

42.     The 2015 Idaho Panhandle National Forest Plan includes the 2011 Forest

Plan Amendments for Motorized Access Management within the Selkirk and

Cabinet-Yaak Grizzly Bear Recovery Zones (Access Amendment) through

8

standard FW-STD-WL-02.

43.    In part, the Access Amendment requires:

> II. The following access management applies to seven grizzly bear recurring use areas (i.e., BORZ areas) located outside of the Cabinet-Yaak Grizzly Bear Recovery Zone (KNF and IPNFs) and Selkirk Grizzly Bear Recovery Zone (IPNFs):
>
> > A. The Forests shall ensure no increases in permanent linear miles of open road on National Forest System lands in any individual BORZ, above the baseline conditions identified in table 26, except in cases where the Forest Service lacks discretion to prevent road building across National Forest System lands due to legal or other obligations (examples include, but are not limited to, ANILCA claims, identification of RS2477 thoroughfares). Potential increases in linear miles of open roads must be compensated for with in-kind reductions in linear miles of open road concurrently with, or prior to, project implementation within the same BORZ. Temporary increases in linear miles of open roads are acceptable under the following conditions:
> >
> > > 1. Roads that are closed to public motorized use or roads created or reconstructed to facilitate land management activities that are otherwise closed to public use may be "opened" to the public immediately following completion of all mechanized harvest and post-harvest slash activities requiring use of the road, to allow motorized public use during the bear summer season prior to the fall bear hunt (i.e., June 16 - August 31) for activities such as personal firewood collection. This public access would only be provided in cases where the mechanized harvest and/or post-harvest slash activities occurred during the same active bear year.
> >
> > B. The Forest shall ensure no net permanent increases in linear miles of total roads in any individual BORZ area above the baseline conditions identified in table 26, except in cases where the Forest Service lacks discretion to prevent road building across National Forest System lands due to legal or other obligations (examples include, but are not limited to, ANILCA claims, identification of

9

RS2477 thoroughfares, etc.). Otherwise, potential increases in linear miles of total roads must be compensated for with in-kind reductions in linear total road miles concurrently with, or prior to, new road construction or reconstruction of currently bermed or barriered roads. Temporary increases (not off-set) in linear miles of total roads are acceptable under the following conditions:

> 1. Temporary increases in linear miles of total roads are acceptable under the following conditions:

>> a. Newly constructed roads would be effectively gated and would be restricted with a CFR closure clarifying they are not open for public use.

>> b. These roads shall be closed immediately upon completion of activities requiring use of the road, except as described in Part II., A.1., above. Roads must be closed with a berm, guardrail or other measure that effectively prevents motorized access, and put in a condition such that a need for motorized access for maintenance is not anticipated for at least 10 years.

>> c. Upon completion of a land management project, linear miles of total roads would be returned to or below the baseline levels contained in table 26.

> C. Timber harvest activities that would occur within multiple watersheds shall be scheduled such that disturbance of grizzly bears resulting from road use is minimized. The appropriate scale for scheduling harvest activities would be determined pursuant to project level consultation.

44.  Table 26 in the 2015 Idaho Panhandle National Forest Plan states that the

Access Amendment baseline for total roads in the Priest BORZ is <u>316.4</u>

<u>miles</u>, and the Access Amendment baseline for open roads in the Priest

BORZ is <u>314.4 miles</u>.

45.    Table 26 in the 2015 Idaho Panhandle National Forest Plan mirrors Table 16
of the Access Amendment Record of Decision and Table 4 of the Access
Amendment Biological Opinion.

46.    The existing condition of permanent roads in the Priest BORZ today is set
forth in the Forest Service's annual road closure monitoring reports, which
are required by the Access Amendment.

47.    The 2017 Forest Service road closure monitoring report disclosed 325.7 miles
of total roads and 317.2 miles of open roads in the Priest BORZ area, but
explained that the Tower logging project had temporarily increased total
roads with 1.9 miles of temporary road construction and 4.6 miles of road
reconstruction.

48.    In the 2018 Forest Service road closure monitoring report, after completion of
the Tower logging project, the Forest Service indicates that total roads are
back down to 319.2 miles and open roads are 317.2 miles.

49.    The Forest Service prepared a separate "Terrestrial Wildlife Specialist
Report" (Wildlife Report) for the Project.

50.    The Wildlife Report represents that the existing condition is 314.5 miles of
total roads and 312.5 miles of open roads.

51.    The Project Wildlife Report does not disclose the existing condition set forth
in the Forest Service road closure monitoring reports.

52.   The Project Biological Assessment does not disclose the existing condition set forth in the Forest Service road closure monitoring reports.

53.   The Project Biological Assessment states: "The 16.63 miles of roads that are currently receiving illegal use would be barriered with this project (Table 8 and Figure 3)."

54.   The Forest Service states that there would be a temporary increase of 9.09 miles of road for the Project.

55.   The 9.09 miles includes 8.39 miles of unauthorized roads that are not part of the current Forest Service road system, and 0.7 miles of newly-constructed temporary roads.

56.   Of these 9.09 miles of Project roads, 4.62 miles are included in the estimate of 16.63 miles of roads that are currently receiving illegal use.

57.   Thus, of the 9.09 miles of Project roads, 3.77 miles are unauthorized roads that are not part of the Forest Service road system but are not documented to have current illegal motorized use.

58.   The Forest Service states that it will also "store," i.e. install a barrier, on 1.2 miles of currently open Forest Service road system roads.

59.   The installation of a barrier on 1.2 miles of currently open Forest Service road system roads will create a 1.2 mile net reduction in open and total roads in the Priest BORZ.

60.    Because the existing condition reported by the Forest Service for the Priest

        BORZ is 319.2 miles of total roads, the Project will result in a net permanent

        condition of 318.0 miles of total roads in the Priest BORZ.

61.    Because the existing condition reported by the Forest Service for the Priest

        BORZ is 317.2 miles of open roads, the Project will result in a net permanent

        condition of 316.0 miles of open roads in the Priest BORZ.

62.    The Forest Service did not survey the entire Priest BORZ for illegal road use.

63.    In its analysis documents, the Forest Service does not address past or present

        illegal motorized use outside the Project area but inside the Priest BORZ

        area.

64.    In its analysis documents, the Forest Service does not address reasonably

        foreseeable illegal motorized use inside the Priest BORZ area.

SCOPING NOTICE

65.    The Scoping Notice for the Project was sent to the public in August 2017.

66.    The Forest Service allowed a 30-day public comment period in response to

        the Scoping Notice.

67.    The Scoping Notice states that the Project would likely be exempt from

        documentation in an Environmental Assessment or Environmental Impact

        Statement, based upon the insect and disease infestation categorical exclusion

        found in the HFRA at 16 U.S.C. §6591b.

13

68.    The Scoping Notice states:  "The insect and disease infestation category is applicable for this project because . . . the entire project area is in the wildland-urban interface . . . ."

69.    In the Scoping Notice, the Forest Service states that the Project "lies entirely within the wildland-urban interface defined by Bonner County."

70.    The Scoping Notice does not provide the definition of wildland urban interface.

71.    The Scoping Notice does not provide a map of wildland-urban interface.

72.    At the time the Scoping Notice was issued, the Forest Service webpage did not include a link to or copy of the Bonner County Community Wildfire Protection Plan, Bonner County definition of wildland urban interface, or Bonner County map of wildland urban interface.

73.    The Scoping Notice does not disclose the Access Amendment requirements.

74.    The Scoping Notice does not disclose the fact that the Project is in occupied grizzly bear habitat.

75.    The Scoping Notice does not disclose the 16.6 miles of illegal motorized use occurring in the Project area.

76.    The Scoping Notice does not disclose the current miles of roads in the Priest BORZ as set forth in the Forest Service's annual road closure monitoring report.

14

BONNER COUNTY WILDLAND URBAN INTERFACE

77. As of the date of the filing of this lawsuit, the Forest Service webpage has never included a link to or copy of the Bonner County Community Wildfire Protection Plan, Bonner County definition of wildland urban interface, or Bonner County map of wildland urban interface.

78. The Bonner County Community Wildfire Protection Plan defines wildland urban interface as "an area where developed lands interact with undeveloped lands and includes the infrastructure and natural resources communities rely on for existence. Location: It is found in remote scattered development areas to highly developed urban areas and everywhere in between."

79. The Bonner County wildland urban interface definition was not disclosed to the public in any of the Forest Service's analysis documents for the Project.

80. The Bonner County Community Wildfire Protection Plan maps almost the entire county as wildland urban interface.

81. The Bonner County wildland urban interface map was not disclosed to the public in any of the Forest Service's analysis documents for the Project.

82. The Bonner County Community Wildfire Protection Plan was not analyzed in a NEPA analysis.

83. The Bonner County wildland urban interface definition was not analyzed in a NEPA analysis.

84.   The Bonner County wildland urban interface map was not analyzed in a

NEPA analysis.

DECISION MEMO

85.   The Decision Memo for the Project was signed on October 11, 2018.

86.   The Decision Memo does not disclose the existing condition of road mileage

reported in the Forest Service's annual road closure monitoring reports.

87.   As of the date of the filing of this lawsuit, the Forest Service webpage for the

Project has never provided a link to or copy of the Forest Service's annual

road closure monitoring reports.

88.   In Appendix C, Project Design Features, Wildlife, Paragraph 5, the Decision

Memo states:

> 5. Grizzly bear~ Temporary increases in linear miles associated
> with this project would be acceptable under the following
> conditions:
>
> a. All roads not designated as open on the motor vehicle use map
> would be effectively gated and would require a Code of Federal
> Regulation closure clarifying they are not open for public use.
>
> b. All roads not designated as open on the motor vehicle use
> map would be closed immediately upon completion of activities
> requiring use of the road. Roads must be closed with a berm,
> guardrail or other measure that effectively prevents motorized
> access (front end obliteration is the preferred method), and put in
> a condition such that a need for motorized access for
> maintenance is not anticipated for at least 10 years. Upon
> completion of the Hanna Flats Good Neighbor Authority Project,
> linear miles of total roads would be returned to or below the
> baseline levels.

Estimated Effectiveness -High. These are standards from the
motorized access amendment direction (USDA Forest Service
2011a). The standards were put in place to conserve grizzly bear
habitat within the BORZ areas (USDI 201lb). This provision would
be built into timber harvest contracts and implemented by the sale
administrator.

89. Appendix C, Project Design Features, Wildlife, Paragraph 5

paraphrases Access Amendment section II (B)(1).

90. Appendix C, Project Design Features, Wildlife, Paragraph 5 omits part

of the requirement of  Access Amendment section II (B)(1)(c), which

states in full: "Upon completion of a land management project, linear

miles of total roads would be returned to or below the baseline levels

*contained in table 26*."  (Emphasis added).

91. Appendix C, Project Design Features, Wildlife, Paragraph 5 does not

disclose that the Forest Plan Table 26 states that the linear miles of

total roads baseline level for the Priest BORZ is <u>316.4 miles</u>.

92. Appendix C, Project Design Features, Wildlife, Paragraph 5 does not

disclose that the Forest Service road closure monitoring reports

indicate that the existing condition for total roads is <u>319.2 miles</u>.

93. Appendix C, Project Design Features, Wildlife, Paragraph 5 does not

disclose that post-Project condition for total roads will be <u>318.0 miles</u>.

94. Appendix C, Project Design Features, Wildlife, Paragraph 5 does not

acknowledge that 16.6 miles of roads not designated as open on the motor vehicle use map are not effectively gated and instead are currently receiving illegal motorized use.

95.    Appendix C, Project Design Features, Wildlife does not disclose the requirements from Access Amendment section II(A)(1) for temporary increases in open roads.

96.    The Decision Memo states: "The entire project is in the wildland-urban interface. See the 'Fire, Fuels, and Air Quality' resource report filed on the project webpage [web address omitted]."

97.    The Decision Memo does not provide the definition of wildland urban interface that the Forest Service used for the Project.

98.    The Decision Memo does not provide the map of wildland-urban interface that the Forest Service used for the Project.

99.    The "Fire, Fuels, and Air Quality Report" states: "This area is in wildland urban interface and areas of intermixed ownership, and thus is not high priority for the use of wildland fire."

100.    The "Fire, Fuels, and Air Quality Report" does not provide a citation for the representation that the Project area "is in wildland urban interface. . . ."

101.    The "Fire, Fuels, and Air Quality Report" does not provide the

definition of wildland urban interface that the Forest Service used for the Project.

102.   The "Fire, Fuels, and Air Quality Report" does not provide a map of wildland-urban interface that the Forest Service used for the Project.

## VII.  CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

The Forest Service has failed to demonstrate compliance with the Access Amendment, in violation of the Forest Plan, NFMA, NEPA, HFRA, and the APA.

103.   All above paragraphs are incorporated by reference.

104.   The Forest Service is allowing a temporary increase in *open* roads by allowing known illegal public motorized use to continue on 16.63 miles of roads during Project planning and implementation.

105.   A temporary increase in *open* roads is only permitted by the Access Amendment under certain specific circumstances:

(1) "immediately following completion of all mechanized harvest and post-harvest slash activities requiring use of the road,"

(2) in the year that work is finished, and

(3) for the time period  June 16 - August 31.

106.   The temporary illegal and known public use on 16.63 miles of road for multiple years during Project planning and implementation does not comply

with any of these three unequivocal restrictions for lawful temporary *open* road increases.

107.   Thus, the Forest Service is violating the Access Amendment by allowing *unlawful* temporary increases in *open* roads.

108.   Additionally, the Forest Service is allowing a temporary increase in *total* roads by allowing known illegal public motorized use to continue on over 16.63 miles of roads that were admittedly not included in the Access Amendment total road baseline.

109.   A temporary increase in *total* roads is only permitted by the Access Amendment under certain specific circumstances:  the roads must be both (1) "effectively gated" and (2) "restricted with a CFR closure clarifying they are not open for public use."

110.   There is no "effective" gate on these roads because public use is still occurring.

111.   Thus, the Forest Service is violating the Access Amendment by allowing *unlawful* temporary increases in *total* roads.

112.   Finally, the Forest Service is not complying with the Access Amendment total road requirement that states: "Upon completion of a land management project, linear miles of total roads would be returned to or below the baseline levels contained in table 26."

113.   As noted above, the existing condition for the Priest BORZ is 319.2 miles of total roads and the Project will result in net reduction of 1.2 miles of total roads.

114.   Thus, upon Project completion, linear miles of total roads in the Priest BORZ would be 318.0 miles.

115.   Forest Plan Table 26 sets the total road baseline for the Priest BORZ at 316.4 miles.

116.   Thus, the Forest Service is violating the requirement that "linear miles of total roads would be returned to or below the baseline levels contained in table 26."

117.   The Forest Service's failure to demonstrate compliance with the Access Amendment violates its own Forest Plan and therefore violates NFMA.

118.   Additionally, the Forest Service's failure to comply with its Forest Plan violates the requirement of the HFRA insect and disease categorical exclusion, which states: "All projects and activities carried out under this section shall be consistent with the land and resource management plan established under section 1604 of this title for the unit of the National Forest System containing the projects and activities." 16 U.S.C. §6591b (e). Therefore, this categorical exclusion is inapplicable, and the Forest Service may not rely on this categorical exclusion to justify its failure to prepare an

EA or EIS for this Project.  The failure to prepare an EA or EIS violates NEPA.

119.  Additionally, the Forest Service's failure to demonstrate compliance with its Forest Plan and its failure to fully and fairly inform the public on this issue violates NEPA.  The Forest Service did not disclose to the public all applicable requirements of the Access Amendment, did not disclose the actual known existing condition of road miles in the Priest BORZ, and did not disclose the fact that the existing and post-Project condition will violate the Access Amendment baseline.  Instead, the Forest Service provided an analysis to the public that was misleading, inadequate, and/or false in violation of NEPA.

120.  Finally, the Forest Service's failure to issue a decision that is in accordance with law and procedures required by law is a violation of the APA.

## SECOND CLAIM FOR RELIEF

The Forest Service has failed to establish that this Project is in "wildland urban interface" as defined under the HFRA; therefore it has not established that it may categorically exclude this Project from NEPA analysis and administrative review.

121.  All above paragraphs are incorporated by reference.

122.  The Forest Service categorically excluded this Project from analysis in an Environmental Assessment or Environmental Impact Statement, and

categorically excluded this Project from administrative review, under 16
U.S.C. §§ 6591b (a)(1),(2).

123.   16 U.S.C. § 6591b requires:  "A project under this section shall be limited to
areas – (A) in the wildland-urban interface; or (B) Condition Classes 2 or 3 in
Fire Regime Groups I, II, or III, outside the wildland-urban interface." *Id* at
(c)(2).

124.   The Forest Service's analysis for the Project states that "the entire project
area is in the wildland-urban interface . . . ."

125.   The Forest Service's analysis for the Project does not state that the Project is
located in an area with "Condition Classes 2 or 3 in Fire Regime Groups I, II,
or III."

126.   The HFRA defines wildland urban interface:

The term "wildland-urban interface" means--

(A) an area within or adjacent to an *at-risk community* that is identified in

recommendations to the Secretary *in a community wildfire protection plan*;

or

(B) in the case of any area for which a community wildfire protection plan is

not in effect--

(i) an area extending ½ -mile from the boundary of an at-risk

community;

23

(ii) an area within 1 ½ miles of the boundary of an at-risk community, including any land that--

> (I) has a sustained steep slope that creates the potential for wildfire behavior endangering the at-risk community;
>
> (II) has a geographic feature that aids in creating an effective fire break, such as a road or ridge top; or
>
> (III) is in condition class 3, as documented by the Secretary in the project-specific environmental analysis; and

(iii) an area that is adjacent to an evacuation route for an at-risk community that the Secretary determines, in cooperation with the at-risk community, requires hazardous fuel reduction to provide safer evacuation from the at-risk community.

16 U.S.C. § 6511 (16)(emphases added).

127. There is a community wildfire protection plan in place for Bonner County.

128. The HFRA defines at-risk community:

The term "at-risk community" means an area--

(A) that is comprised of--

> (i) an *interface community as defined in* the notice entitled "Wildland Urban Interface Communities Within the Vicinity of Federal Lands That Are at High Risk From Wildfire" issued by the Secretary of

Agriculture and the Secretary of the Interior in accordance with title IV

of the Department of the Interior and Related Agencies Appropriations

Act, 2001 (114 Stat. 1009) *(66 Fed. Reg. 753*, January 4, 2001); or

(ii) a group of homes and other structures with basic infrastructure and

services (such as utilities and collectively maintained transportation

routes) within or adjacent to Federal land;

(B) in which conditions are conducive to a large-scale wildland fire

disturbance event; and

(C) for which a significant threat to human life or property exists as a result of

a wildland fire disturbance event.

16 U.S.C. § 6511 (1) (emphasis added).

129.    The notice entitled "Wildland Urban Interface Communities Within the

Vicinity of Federal Lands That Are at High Risk From Wildfire" provides the

following definitions:

### Category 1. Interface Community

The Interface Community exists where structures directly abut
wildland fuels. There is a clear line of demarcation between
residential, business, and public structures and wildland fuels.
Wildland fuels do not generally continue into the developed
area. The development density for an interface community is
usually 3 or more structures per acre, with shared municipal
services. Fire protection is generally provided by a local
government fire department with the responsibility to protect the
structure from both an interior fire and an advancing wildland
fire. An alternative definition of the interface community

emphasizes a *population density of 250 or more people per square mile.*

**Category 2. Intermix Community**

The Intermix Community exists where structures are scattered throughout a wildland area. There is no clear line of demarcation; wildland fuels are continuous outside of and within the developed area. The development density in the intermix ranges from structures very close together to one structure per 40 acres. Fire protection districts funded by various taxing authorities normally provide life and property fire protection and may also have wildland fire protection responsibilities. An alternative definition of intermix community emphasizes *a population density of between 28-250 people per square mile.*

**Category 3. Occluded Community**

The Occluded Community generally exists in a situation, often within a city, where structures abut an island of wildland fuels (e.g., park or open space). There is a clear line of demarcation between structures and wildland fuels. The development density for an occluded community is usually similar to those found in the interface community, but the occluded area is usually less than 1,000 acres in size. Fire protection is normally provided by local government fire departments.

Urban Wildland Interface Communities Within the Vicinity of Federal Lands

That Are at High Risk From Wildfire, 66 Fed Reg 751, 753 (Jan. 4, 2001),

2001 WL 7426.

130.   The Bonner County Plan does not use the definition of "at-risk community"

from the HFRA to define and map its wildland urban interface.

131.   The Bonner County Plan does not use the definition of "interface community"

from the 66 Fed. Reg. 753 to define and map its wildland urban interface.

132. The Bonner County Plan uses the following definition to map its wildland urban interface:  "an area where developed lands interact with undeveloped lands and includes the infrastructure and natural resources communities rely on for existence.  Location: It is found in remote scattered development areas to highly developed urban areas and everywhere in between."

133. The Forest Service used the Bonner County Plan wildland urban interface definition and map for the Project.

134. The Forest Service did not independently map "at-risk community" as defined in the HFRA for the Project.

135. The Forest Service did not independently map "interface community" as defined by 66 Fed. Reg. 753 for the Project.

136. The definition and map of wildland urban interface used by the Forest Service for the Project is not consistent with the statutory definition under the HFRA and 66 Fed. Reg. 753.

137. The Forest Service's failure to use the definition required by the HFRA violates the HFRA and renders its use of the HFRA categorical exclusion unlawful.  Because this categorical exclusion does not apply to this Project area, the Forest Service's failure to provide NEPA analysis in the form of an Environmental Assessment or Environmental Impact Statement violates NEPA and the APA.

## THIRD CLAIM FOR RELIEF

The Bonner County Plan – or at least the WUI definition and/or WUI map found within that plan – constitutes a "major federal action" under 40 C.F.R. § 1508.18 that requires NEPA analysis; the Forest Service's failure to conduct that NEPA analysis renders its project-level tiering unlawful in violation of NEPA.

138.   All above paragraphs are incorporated by reference.

139.   The CEQ regulations, which implement NEPA, are binding on the Forest Service.

140.   The Forest Service does not receive deference when implementing the CEQ regulations because those regulations were not issued by the Forest Service.

141.   The CEQ regulations state:  "Major federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility."  40 C.F.R. § 1508.18.

142.   The CEQ regulations state: "Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§§ 1506.8, 1508.17).  Actions do not include funding assistance solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. 1221 et seq., with no Federal

agency control over the subsequent use of such funds. Actions do not include

bringing judicial or administrative civil or criminal enforcement actions." 40

C.F.R. § 1508.18.

143.   The CEQ regulations state: "Federal actions tend to fall within one of the

following categories:

> (1) Adoption of official policy, such as rules, regulations, and
>
> interpretations adopted pursuant to the Administrative Procedure Act, 5
>
> U.S.C. 551 et seq.; treaties and international conventions or agreements;
>
> formal documents establishing an agency's policies which will result in or
>
> substantially alter agency programs.
>
> (2) Adoption of formal plans, such as official documents prepared or
>
> approved by federal agencies which guide or prescribe alternative uses of
>
> Federal resources, upon which future agency actions will be based.
>
> (3) Adoption of programs, such as a group of concerted actions to
>
> implement a specific policy or plan; systematic and connected agency
>
> decisions allocating agency resources to implement a specific statutory
>
> program or executive directive.
>
> (4) Approval of specific projects, such as construction or management
>
> activities located in a defined geographic area. Projects include actions
>
> approved by permit or other regulatory decision as well as federal and

29

federally assisted activities.

40 C.F.R. § 1508.18.

144.   The CEQ regulations state: "Agencies are encouraged to tier their

environmental impact statements to eliminate repetitive discussions of the

same issues and to focus on the actual issues ripe for decision at each level of

environmental review. Whenever a broad environmental impact statement has

been prepared (such as a program or policy statement) and a subsequent

statement or environmental assessment is then prepared on an action included

within the entire program or policy (such as a site specific action) the

subsequent statement or environmental assessment need only summarize the

issues discussed in the broader statement and incorporate discussions from

the broader statement by reference and shall concentrate on the issues

specific to the subsequent action."  40 C.F.R. § 1502.20.

145.   "However, tiering to a document that has not itself been subject to NEPA

review is not permitted, for it circumvents the purpose of NEPA."  *Kern v.*

*U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1073 (9th Cir. 2002)).

146.   The Bonner County Plan was developed and reviewed by the Bonner County

Steering Committee, which included the U.S. Forest Service.

147.   The Bonner County definition and map of "wildland urban interface" guides

or prescribes whether the Forest Service may use a "wildland urban

interface" HFRA categorical exclusion for Forest Service projects in Bonner County.

148.   In the Hanna Flats Project analysis, the Forest Service adopted the definition and map of "wildland urban interface" set forth in the Bonner County Plan.

149.   Without a "wildland urban interface" designation from Bonner County, the Forest Service could not have applied the HFRA categorical exclusion to the Hanna Flats Project.

150.   Without a "wildland urban interface" designation from Bonner County, the Hanna Flats Project would have been required to undergo NEPA analysis in either an Environmental Assessment or Environmental Impact Statement.

151.   The development, review, and adoption of the Bonner County Plan, Bonner County wildland urban interface definition, and/or Bonner County wildland urban interface map constitutes a "major federal action" under 40 C.F.R. § 1508.18 that requires NEPA review.

152.   In violation of NEPA, the Forest Service has not yet conducted a NEPA analysis for the Bonner County Plan, Bonner County wildland urban interface definition, or Bonner County wildland urban interface map.

153.   Other courts have found that similar wildfire management plans adopted and implemented by the Forest Service are major federal actions under NEPA. *See e.g. People of Cal. ex rel. Lockyer v. U.S. Forest Serv.*, 2005 WL

1630020 (N.D. Cal. 2005)(applying 40 C.F.R. § 1508.18(b)(2)); *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 2003 WL 22283969 (N.D. Cal. Sept. 5, 2003).

154.   Alternatively or additionally, "[r]egardless of whether the [] map [or plan or definition] needed to be analyzed under NEPA at the time it was adopted, [] under *Kern* the Forest Service was required to conduct NEPA review of the [] map [or plan or definition] before using [it] as a basis for approving the [challenged] Project." *See Native Ecosystems Council v. USFS*, 866 F. Supp. 2d 1209, 1227 (D. Idaho 2012)(*citing Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062 (9th Cir. 2002)).

155.   A failure to conduct a NEPA analysis for the Bonner County Plan, WUI definition, and/or WUI map before using those documents as the basis for the Hanna Flats Project constitutes illegal tiering under NEPA under *Kern, Native Ecosystems Council,* and 40 C.F.R. § 1502.20.  *See also California, ex rel. Lockyer v. U.S. Forest Serv.*, 465 F. Supp. 2d 942, 954 (N.D. Cal. 2006)("Because the FEIS relies on this guidance from the Fire Plan, which itself is in violation of NEPA, the Court therefore concludes that the FEIS improperly tiers to the Fire Plan under *Kern*.")

156.   For these reasons, the Forest Service's conduct violates NEPA and is arbitrary and capricious and contrary to law or procedures required by law in violation of the APA.

## VIII.  RELIEF REQUESTED

For all of the above-stated reasons, Plaintiff requests that this Court award the following relief:

A.     Declare that the Project violates the law;

B.     Either vacate the Project Decision or enjoin implementation of the Project;

C.     Award Plaintiff its costs, expenses, expert witness fees, and reasonable

attorney fees under EAJA; and

D.     Grant Plaintiff any such further relief as may be just, proper, and equitable.


DATED this 29th Day of August, 2019.


/s/Rebecca K. Smith
REBECCA K.  SMITH
Public Interest Defense Center, P.C.

Attorney for Plaintiff