# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, | Case No.: 2:19-cv-00332-REB |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER RE:** |
| vs. | **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Dkts. 22 & 45)** |
| JEANNE HIGGINS, Idaho Panhandle National Forest Supervisor, UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture, and UNITED STATES FISH & WILDLIFE SERVICE, an agency of the U.S. Department of Interior, | **DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT (Dkt. 28)** |
| Defendants. | **PLAINTIFF'S MOTION TO STRIKE DEFENDANTS' DKT. 54 FILING (Dkt. 55)** |
| | **DEFENDANTS' MOTION TO DISMISS (Dkt. 60)** |

Pending before the Court are the following motions: (1) Plaintiff's Motion for Summary Judgment (Dkt. 22 & 25); (2) Defendants' Cross-Motion for Summary Judgment (Dkt. 28); (3) Plaintiff's Motion to Strike Defendants' Dkt. 54 Filing (Dkt. 55); and (4) Defendants' Motion to Dismiss (Dkt. 60). Having carefully considered the record, participated in oral argument,[1] and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. RELEVANT BACKGROUND

This is a civil action for judicial review under the Administrative Procedure Act ("APA") and Endangered Species Act ("ESA") of Defendant U.S. Forest Service's ("USFS") October 11, 2018 "Decision Memo" approving the Hanna Flats Project (the "Project") on the Idaho

---

[1] At the time of the September 1, 2020 hearing, only the parties' cross-motions for summary judgment were pending.

**MEMORANDUM DECISION AND ORDER - 1**

Panhandle National Forest ("IPNF").  Plaintiff Alliance for the Wild Rockies ("Alliance") argues that the final decision approving the Project is arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law.  Specifically, Alliance contends that, in approving the Project, the USFS (1) violated the Access Amendment(s)[2] in violation of the ESA, the National Forest Management Act ("NFMA"), the Healthy Forest Restoration Act ("HFRA"), the National Environmental Policy Act ("NEPA"), and the APA;[3] and (2) failed to establish that the Project meets the definition of "wildland urban interface" in violation of both HFRA and NEPA.[4]  In turn, Alliance requests that the "Project Decision" be vacated or that implementation of the Project be enjoined pending compliance with the law.

Since Alliance initiated this action in August 2019, Defendants reinitiated/completed ESA Section 7 consultation on the IPNF's Land and Resource Management Plan (the "IPNF Forest Plan") in August 2020; Defendants reinitiated/completed ESA Section 7 consultation on the Project in October 2020; and the USFS completed a Supplemental Information Report in October 2020, which determined that an additional NEPA analysis was not necessary.  According to Defendants, these intervening factors are relevant to the Court's consideration of certain of Alliance's claims/remedies – raising them throughout the pendency of the action (via

---

[2]  The Access Amendments are forest plan amendments implemented by the USFS and Defendant U.S. Fish and Wildlife Service ("FWS") to set standards for motorized use in habitat for the Selkirk and Cabinet-Yaak grizzly bear populations in northwestern Montana and northern Idaho; the Access Amendments apply mandatory road restrictions to National Forest lands within both the bears' official "Recovery Zones," as well as occupied habitat outside these areas (referred to as "Bears Outside Recovery Zones" or BORZ" areas).  *Compare* Alliance's SOF ¶¶ 30-44 (Dkt. 23), *with* Defs.' Resp. to SOF ¶¶ 30-44 (Dkt. 29-1), Defs.' SOF ¶¶ 1-21 (Dkt. 28-2), Alliance's Resp. to SOF ¶¶ 1-4 (Dkt. 36).

[3]  These allegations generally inform Alliance's First, Second, Third, and Sixth Claims for Relief.  *See* First Am. Compl. ¶¶ 116-53, 90-95 (Dkt. 14).

[4]  These allegations generally inform Alliance's Fourth and Fifth Claims for Relief.  *See* First Am. Compl. ¶¶ 154-89 (Dkt. 14).

**MEMORANDUM DECISION AND ORDER - 2**

both formal notices filed with the Court, as well as within their briefing on the at-issue motions

for summary judgment), culminating in their recently-filed Motion to Dismiss.  To be sure,

Defendants now move to dismiss Alliance's First, Second, Third, and Sixth Claims for Relief as

moot, arguing in part:

> Claims Two and Three are now moot because USFS and FWS concluded reinitiated
> Section 7 consultation under the ESA on both the Forest Plan and Project.  Claims
> One and Six are closely related to the ESA claims and are now moot because USFS
> determined that in light of the concluded reinitiated ESA Section 7 consultations,
> the Project continues to satisfy a statutory exception to NEPA established in Section
> 603 of the Healthy Forest and Restoration Act ("HFRA").  Now that both ESA
> consultations are complete and USFS has determined no additional NEPA analysis
> is warranted, there is no effective relief that this Court may grant for these claims
> as pleaded in the Amended Complaint.  The Court should dismiss Claims One,
> Two, Three, and Six as moot.

Defs.' Mem. ISO MTD, p. 2 (Dkt. 60-1).

Alliance no-doubt disagrees, but the fact remains that these thorny jurisdictional matters

are not fully briefed and before this Court.[5]  At the same time, boots-on-the-ground operations

relating to the timber sales authorized by the Project are set to commence in early May 2021.

These cross-currents leave the Court with little time to synthesize all of the parties' arguments

(inchoate or not) into a single Memorandum Decision and Order.

---

[5] On this point, Alliance's Motion to Strike (filed approximately 5 months before Defendants' Motion to Dismiss) takes issue with Defendants' practice of filing notices to the Court without an opportunity for it to respond under the District's Local Civil Rules.  *See* Mem. ISO Mot. to Strike, pp. 1-2 (Dkt. 55-1) ("By filing their request for dismissal of Plaintiff's claims as a 'notice' rather than as a motion to dismiss, Defendants not only violate Federal Rule of Civil Procedure 7(b)(1), which requires a motion, but they also strip away Plaintiff's ability to file a responsive brief within 21 days in accordance with Local Rule 7.1. . . .  Instead of filing a 'notice' that argues mootness, Defendants instead should file a motion to dismiss if they belief that any of Plaintiff's claims are moot.  This is an issue that must be fully briefed by the parties before any mootness determination is made because Plaintiff strongly disagrees that Defendants' recent filings in this case render any of Plaintiff's claims moot.").  The undersigned has similarly struggled with how to incorporate and address these circumstances into the broader milieu of the action (at least as framed by Alliance's Claims for Relief), quizzing the parties' counsel on the matter during oral argument, and within April 5, 2021 correspondence that prompted the parties' April 7, 2021 Joint Status Report (and likely Defendants' subsequent Motion to Dismiss).

**MEMORANDUM DECISION AND ORDER - 3**

Despite this, the claims associated with the Project's purported fit within a wildland urban interface (Alliance's Fourth and Fifth Claims for Relief) remain unaffected, such that the parties' cross-motions for summary judgment on these claims can be decided. This Memorandum Decision and Order does just that – dealing with Alliance's Fourth and Fifth Claims for Relief and a keystone issue of whether the Project was properly categorically excluded from NEPA analysis owing to its integration into a wildland urban interface as designated in a county wildfire protection plan. Because this Court's decision on that issue effectively suspends the Project and remands it back to the USFS, it is not necessary to resolve other issues raised by the Project as it is *currently* situated, to include Defendants' challenges to Alliance's other claims, or, likewise, the merits of those same claims.[6]

In this setting, then, the relevant chronological factual backdrop is as follows:

A.    **The Project**

1.    On October 11, 2018, Defendant Jeanne E. Higgins signed a Decision Memo authorizing the Project on the IPNF; the Project area is 6,814 acres in size, is located in the Priest Lake Ranger District of the IPNF, which in turn is located in Bonner County, Idaho, approximately two miles west of Priest Lake and 25 miles north of the town of Priest River, Idaho. *See* Alliance's SOF ¶¶ 1-2 (Dkt. 23) (citing AR 27378, 27361).

2.    The Project's stated objectives include the following: (1) "reduce the risk or extent of, or increase resilience to, insect or disease infestation"; (2) "increase the quantity and maintain or improve the vigor (health) of long-lived, drought-resistant, fire-adapted western

---

[6] The arguments surrounding the viability of Alliance's First, Second, Third, and Sixth Claims for Relief simply cannot be resolved as matter of law at this time. If, after remand, Alliance seeks to challenge the Project *on a more developed and up-to-date record*, it is free to do so in a separate action. Until then, however, the parties' cross-motions for summary judgment as to these claims are denied, without prejudice, alongside Alliance's Motion to Strike and Defendants' Motion to Dismiss.

**MEMORANDUM DECISION AND ORDER - 4**

white pine, western larch, and ponderosa pine trees"; (3) "decrease the quantity, and modify the arrangement, of hazardous forest fuels to reduce the current and future wildfire risk to people, private lands, and resource values"; (4) "contribute to the local economy and forest products industry through timber production"; (5) "decrease the amount of road-related sediment reaching streams and reduce the risk of road culvert failures"; (6) "improve the current condition of the existing cross-county ski and snowshoe trail system in the project area and provide a new route to connect existing trail systems"; and (7) "identify additional forest stands in the project area that are suitable and appropriate to manage for recruitment potential old growth."  AR 14425-26.

3.       Approximately 6,598 acres of the Project are on National Forest System land; the remainder (approximately 216 acres) are privately-owned; the Project is dominated by dense, mixed-conifer forest stands and is often used by the public for various recreational activities, including cross-country skiing, snowmobiling, hiking, dog sled races, and running races.  *See* Defs.' SOF ¶¶ 44-45 (Dkt. 28-2) (citing AR 14420).

4.       The Project involves various types of "forest stand treatments" over approximately 2,352 acres, including the following treatment type and acreage:  "commercial thin" (478 acres); "clearcut with reserves" (74 acres); "seed tree with reserves" (53 acres); "shelterwood with reserves" (750 acres); "variable density mosaic" (488 acres); "precommercial thinning, white pine pruning, or both" (360 acres); and "prescribed burn only" (149 acres).  *See* AR 27362; *see also* 14456-62 (Scoping Notice Appendix B, discussing "Descriptions of Proposed Vegetation Treatments").  "Some level of tree planting will occur over approximately 1,327 of the total 2,352 acres" of the Project.  AR 27362.

5.       The Project also authorizes temporary road construction, excavated skid trail construction, and road maintenance/reconstruction.  *See* Alliance's SOF ¶ 5 (Dkt. 23) (citing AR 27363).

**MEMORANDUM DECISION AND ORDER - 5**

6.      The USFS estimates that the Project will likely take 5-10 years to implement.  *See* Alliance's SOF ¶ 7 (Dkt. 23) (citing AR 27365).

**B.      The Categorical Exclusion and Wildland-Urban Interface[7]**

7.      In August 2017, the Scoping Notice for the Project was sent to the public, seeking comment on the Project by September 2, 2017.  *See* Alliance's SOF ¶¶ 8-9 (Dkt. 23) (citing AR 14414, 14559).

8.      The Scoping Notice states that the Project would likely be exempt from documentation in an Environmental Assessment ("EA") or Environmental Impact Statement ("EIS") because of the insect and disease infestation categorical exclusion ("CE") found in HFRA.  *See* Alliance's SOF ¶ 10 (Dkt. 23) (citing AR 14451-52 (Scoping Notice describing "Use of Categorical Exclusion Categories," "Insect and Disease Infestation Categorical Exclusion," and "Requirements and Limitations for Use of the Categorical Exclusion")).

9.      The Scoping Notice  states:  "The insect and disease infestation [categorical exclusion] is applicable for this project because . . . the entire project area is in the wildland-urban interface . . . .").  *See* Alliance's SOF ¶ 11 (Dkt. 23) (quoting AR 14452); *see also* AR 14432 (Scoping Notice stating Project "lies entirely within the wildland-urban interface defined by Bonner County['s Community Wildfire Protection Plan].").[8]

---

[7]  In the years leading up to the Project, in March 2014, the Governor of Idaho requested that the Secretary of Agriculture designate over 10 million acres in Idaho (including the Hanna Flats area), as landscape-scale treatment area under Section 602 of HFRA.  *See* Defs.' SOF ¶ 31 (Dkt. 28-2) (citing AR 11305-06, 11317, 11320, 11327).  Through delegated authority, the Chief of the USFS designated the Hanna Flats area as one of 50 landscape-scale areas on National Forests in Idaho on May 20, 2014.  *See* Defs' SOF ¶ 32 (Dkt. 28-2) (citing AR 11449-50).

[8]  The administrative record contains two different versions of the Bonner County Community Wildfire Protection Plan ("Wildfire Plan") – the 2012 version and the 2016 version.  *See* Alliance's SOF ¶ 22 (Dkt. 23) (citing AR 9547-84 (2012 version), 28924-76 (2016 version)).  Alliance claims that it is unclear which version the USFS used for the Project.  *See id.*

**MEMORANDUM DECISION AND ORDER - 6**

10.     The Scoping Notice does not, however, (1) define the wildland-urban interface utilized within the Bonner County Wildfire Plan(s), or (2) contain a map of the wildland-urban interface involved in the Project.  *See* Alliance's SOF ¶¶ 13-14 (Dkt. 23) (citing AR 14414-63 (entire Scoping Notice)); *but see* Defs.' Resp. to Alliance's SOF, ¶¶ 13-14 (Dkt. 29-1) (not disputing absence of definition of wildland-urban interface or map of wildland-urban interface in Scoping Notice, but "clarify[ing] that the 2016 Bonner County [Wildfire Plan] and 2017 Bonner County All Hazard Mitigation Plan provide both a map of and definition for the Bonner County wildland urban interface." (citing AR 28924, 29892)).

11.     The Decision Memo states that the Project activities fall within three categories of actions that may be excluded from documentation within an EA or EIS, including the "insect and disease infestation categorical exclusion" because, in part, "[t]he entire project is in the wildland-urban interface.  See the 'Fire, Fuels, and Air Quality' resources report filed on the project webpage . . . .").  *See* Alliance's SOF ¶ 15 (Dkt. 23) (quoting AR 27366); *see also* Defs.' SOF ¶¶ 67-68 (Dkt. 28-2) (citing AR 27365-69).  The Decision Memo goes on to state that "there are no extraordinary circumstances that warrant further analysis and documentation in an [EA] or [EIS].  *See* Defs.' SOF ¶ 69 (Dkt. 28-2) (citing AR 27366).

12.     As with the Scoping Notice, the Decision Memo does not include either (1) the definition of wildland-urban interface used by the USFS for the Project, or (2) a map of the wildland-urban interface that the USFS used for the Project.  *See* Alliance's SOF ¶¶ 16-17 (Dkt. 23) (citing AR 27361-412 (entire Decision Memo)); *but see* Defs.' Resp. to Alliance's SOF, ¶¶ 16-17 (Dkt. 29-1) (not disputing absence of definition of wildland-urban interface or map of wildland-urban interface in Decision Memo, but "clarify[ing] that the 2016 Bonner County [Wildfire Plan] and 2017 Bonner County All Hazard Mitigation Plan provide both a map of and definition for the Bonner County wildland urban interface." (citing AR 28924, 29892)).

**MEMORANDUM DECISION AND ORDER - 7**

13.     The February 2018 "Fire, Fuels, and Air Quality Report" states:  "This area is in wildland-urban interface and areas of intermixed ownership and thus is not high priority for the use of wildland fire."  *See* Alliance's SOF ¶ 18 (Dkt. 23) (quoting AR 25343); *but see* Defs.' Resp. to Alliance's SOF No. 18 (Dkt. 29-1) (disputing Alliance's "characterization of the record materials").

14.     Alliance alleges that the Fire, Fuels, and Air Quality Report does not include either (1) a citation for the representation that the Project "is in a wildland-urban interface," (2) the definition of wildland-urban interface used by the USFS for the Project, or (3) a map of the wildland-urban interface that the USFS used for the Project.  *See* Alliance's SOF ¶¶ 19-21 (Dkt. 23) (citing AR 25322-46 (entire Fire, Fuels, and Air Quality Report)); *but see* Defs.' Resp. to Alliance's SOF ¶¶ 19-21 (Dkt. 29-1) (disputing absence of citation for representation that Project is in wildland-urban interface or definition of wildland-urban interface, but not disputing absence of map of wildland-urban interface in Fire, Fuels, and Air Quality Report, while "clarify[ing] that the 2016 Bonner County [Wildfire Plan] and 2017 Bonner County All Hazard Mitigation Plan provide both a map of and definition for the Bonner County wildland urban interface." (citing AR 28924, 29892)).

15.     Bonner County's 2012 Wildfire Plan states:  "For purposes of this plan, **the Wildland-Urban Interface (WUI) includes any area within two miles of dwellings used for human habitation and/or infrastructure that serves these points of habitation** (see Appendix A for a complete definition of Wildland-Urban Interface)."  *See* Alliance's SOF ¶ 23 (Dkt. 23) (quoting AR 9572 (emphasis in original)).[9]  The 2012 Wildfire Plan does not contain a map of

---

[9]  Although the above-referenced definition of wildland-urban interface contained within Bonner County's 2012 Wildfire Plan references an Appendix A, there is no such Appendix A to the 2012 Wildfire Plan.  *See* Alliance's SOF ¶ 23 (Dkt. 23) (citing AR 9547-84 (entire 2012 Wildfire Plan)).

the wildland-urban interface.  *See* Alliance's SOF ¶ 24 (Dkt. 23) (citing AR 9547-84 (entire 2012 Wildfire Plan)).[10]

16.    Bonner County's 2016 Wildfire Plan expands the definition of wildland-urban interface to "an area where developed lands interact with undeveloped lands and includes the infrastructure and natural resources communities rely on for existence.  Location:  It is found in remote scattered development areas to highly developed urban areas and everywhere in between."  *See* Alliance's SOF ¶ 26 (Dkt. 23) (quoting AR 28953).  The 2016 Wildfire Plan contains a map, titled: "Bonner County WUI 2015" – most of Bonner County is located in the wildland-urban interface depicted on this map.  *See* Alliance's SOF ¶¶ 27 (Dkt. 23) (quoting AR 28955); *see also* Defs.' SOF ¶¶ 36-37 (Dkt. 28-2) (citing AR 28952 (2016 Wildfire Plan stating: "[T]he majority of Bonner County is designated as a priority area.  The terrain and fuel conditions that exist across the county dictate that all areas are at high risk to wildfire.")).[11]

## II.  LEGAL STANDARDS

### A.    Administrative Procedure Act ("APA")

Because NEPA and HFRA do not provide a private right of action, compliance with their mandates is reviewed under the APA.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882-83 (1990) (stating that judicial review of agency action proceeds under APA where statute at issue,

---

[10]  Coincidentally, Bonner County's 2012 Wildfire Plan includes "Hanna Flats" as a "Future Fuels project[ ] . . . for which no formal planning efforts have yet occurred."  *See* Defs.' SOF ¶ 30 (Dkt. 28-2) (quoting AR 9583); *see also* Alliance's Resp. to SOF ¶ 8 (Dkt. 36) ("The [USFS] attached a list of its own desired projects as an appendix to the 2012 Wildfire Plan, and that is where the reference to Hanna Flats is found." (quoting AR 9578-84)).

[11]  The administrative record contains another map, titled:  "IDL/Bonner County Wildland-Urban Interface Adopted 2017."  *See* Alliance's SOF ¶ 28 (Dkt. 23) (quoting AR 29234).  Alliance submits that "it is unclear which definition [of wildland-urban interface] was used for this map."  *Id.*  Regardless, as expressed in the Decision Memo, this map shows that the Project is entirely within the wildland-urban interface.  *See* Defs.' SOF ¶ 47 (Dkt. 28-2) (citing AR 29234, 27366, 28955).

**MEMORANDUM DECISION AND ORDER - 9**

NEPA, does not provide cause of action); *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238 (9th Cir. 2005) (same, for HFRA).  Under the APA, an agency action must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "A [decision] is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir. 2010) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The "touchstone of 'arbitrary and capricious' review under the APA is 'reasoned decision-making.'"  *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52).  Courts sustain an agency action if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Id.* (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation omitted)). This standard also applies to how an agency considers and responds to "significant comments" that raise points that could change a decision.  *Id.* (quoting *Am. Mining Congress v. EPA*, 965 F.2d 759, 771 (9th Cir. 1992) (internal quotation omitted)).

Summary judgment is typically appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  However, in a case involving review of a final agency action under the APA, the court's role is limited to reviewing the administrative record, and the standard set forth in Rule 56 does not apply.  *See Colorado River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d

**MEMORANDUM DECISION AND ORDER - 10**

191, 200 (D.D.C. 2012) (citing *Catholic Health Initiatives v. Sebelius*, 658 F. Supp. 2d 113, 117

(D.D.C. 2009), *rev'd on other grounds*, 617 F.3d 490 (D.C. Cir. 2010)).  Rather, under the APA,

"it is the role of the agency to resolve factual issues to arrive at a decision that is supported by

the administrative record, whereas 'the function of the district court is to determine whether or

not as a matter of law the evidence in the administrative record permitted the agency to make the

decision it did.'"  *Id*. (citation omitted); *see also Occidental Eng'g Co. v. Immigration &*

*Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985).  Summary judgment is then the

mechanism for deciding whether, as a matter of law, the agency action passes muster under the

APA.  *See N.w. Motorcycle Ass'n v. U.S. Dep't Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994);

*Occidental Eng'g*, 753 F.2d at 769-70.

   In considering whether an agency's action was arbitrary and capricious, courts are

"highly deferential" to the agency's decision, *Providence Yakima*, 611 F.3d at 1190, and are not

to "substitute [the court's own] judgment for that of the agency."  *J & G Sales Ltd. v. Truscott*,

473 F.3d 1043, 1051 (9th Cir. 2007).  "[C]ourts will 'uphold a decision of less than ideal clarity if

the agency's path may reasonably be discerned.'"  *Id*. at 1052 (quoting *Motor Vehicle Mfrs.*

*Ass'n*, 463 U.S. at 43).  "Moreover, '[w]here the agency's line-drawing does not appear irrational

and the [party challenging the agency action] has not shown that the consequences of the line-

drawing are in any respect dire . . . [courts] will leave that line-drawing to the agency's

discretion.'"  *Id*. (quoting *Leather Indus. of Am. v. EPA*, 40 F.3d 392, 409 (D.C. Cir. 1994)).

However, the agency cannot engage in post-hoc rationalizations; "[t]he grounds upon which an

administrative order must be judged are those upon which the record discloses that its action was

based."  *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943).  Further, when an

agency changes position, it must provide "good reasons" for the shift.  *See F.C.C. v. Fox*

*Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

**MEMORANDUM DECISION AND ORDER - 11**

Despite this forgiving standard, there is no room for a court to "rubber-stamp" an administrative decision.  Instead, the court must make "a substantive inquiry[,] . . . a thorough, probing, in-depth review" of the agency action.  *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971)).  If, after such review, the court holds an agency action to be arbitrary and capricious, "the proper course [is] to remand to the [a]gency."  *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 657 (2007); *see also Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20, (1952) (when reviewing administrative decision, "the function of the reviewing court ends when an error of law is laid bare.").

**B.      National Environmental Policy Act ("NEPA")**

NEPA encourages "'productive and enjoyable harmony between man and his environment,' and was intended from its outset to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States."  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321).  Particular results are not mandated, but NEPA does "prescribe[ ] the necessary process" to avoid "uninformed – rather than unwise – agency action."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-351 (1989).  Council on Environmental Quality ("CEQ") regulations guide federal agencies' compliance with NEPA.  *See* 40 C.F.R. §§ 1500.1-1508.28.

At its core, NEPA requires that agencies prepare a detailed statement – an EIS – in connection with "proposals for . . . major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  Among other things, an EIS must include an explanation of "the environmental impact of the proposed action," "any adverse environmental effects which cannot be avoided should the proposal be implemented," and "alternatives to the

**MEMORANDUM DECISION AND ORDER - 12**

proposed action." *Id*. at §§ 4332(C)(i)-(iii).  The process of preparing the EIS "ensures that the

agency, in reaching its decision, will have available, and will carefully consider, detailed

information concerning significant environmental impacts" and that "the relevant information

will be made available to the larger audience that may also play a role in both the decision-

making process and the implementation of that decision." *Robertson*, 490 U.S. at 349.  "[T]he

broad dissemination of information mandated by NEPA permits the public and other government

agencies to react to the effects of a proposed action at a meaningful time." *Marsh v. Or. Nat.*

*Res. Council*, 490 U.S. 360, 371 (1989).

In deciding whether an EIS is required (*i.e.*, will the proposed project have a significant

effect on the human environment?), the responsible agency may first prepare an Environmental

Assessment ("EA") to assist in making that decision.  40 C.F.R. §§ 1501.3-1501.4.  A "concise

public document," the EA is used to "briefly" discuss "the environmental impacts" and

"alternatives" to the proposed action.  40 C.F.R. § 1508.9.  If the decision is that an EIS is not

necessary, an explanatory Finding of No Significant Impact ("FONSI") is required, to "briefly

present…why an action . . . will not have a significant effect on the human environment."  40

C.F.R. § 1508.13.  Regarding the "threshold question of NEPA applicability," the less deferential

standard of 'reasonableness' applies to threshold agency decisions that certain activities are not

subject to NEPA's procedures." *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 667 (9th Cir.

1998).

"Courts apply a 'rule of reason' standard in reviewing the adequacy of a NEPA

document" – asking whether it "contains a reasonably thorough discussion of the significant

aspects of the probable environmental consequences." *Klamath-Siskiyou Wildlands Ctr. v.*

*Bureau of Land Mgmt.*, 387 F.3d 989, 992 (9th Cir. 2004) (quoting *Churchill Cty v. Norton*, 276

F.3d 1060, 1071 (9th Cir. 2001)).  "This inquiry involves 'a pragmatic judgment whether the

**MEMORANDUM DECISION AND ORDER - 13**

[document's] form, content, and preparation foster both informed decision-making and informed public participation.'" *Protect Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1035 (9th Cir. 2019) (quoting *Churchill Cty.*, 276 F.3d at 1071); *see also California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). To accomplish this, "NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences." *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005) (citation omitted).

Hence, there is a salutary, critical role of the NEPA process in agency decision-making, described in myriad agency decisions and court decisions over many decades. When properly implemented, NEPA procedures "ensure[ ] that the agency will inform the public that it has indeed considered environmental concerns in its decision-making process." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983); *see also* 40 C.F.R. § 1500.1(b) ("Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA."). However, while "a court must '[e]nsure that the agency has taken a hard look at environmental consequences,' a court cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'" *Friends of the Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 913 (9th Cir. 2018) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)); *see also Bair v. Cal. State Dep't of Transp.*, 867 F. Supp. 2d 1058, 1065 (N.D. Cal. 2012) ("Once the agency does the required hard look, it is free to choose to proceed with action that will have an adverse impact on the environment, at least insofar as NEPA is concerned, the idea being that if we are going to destroy the environment, we should do so with ou[r] eyes wide open and not by accident.").

An agency may also promulgate categorical exclusions from NEPA review for actions "which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4. If a proposed action falls within a categorical exclusion, the agency is not

required to prepare an EA or EIS.  *See id.*  "An agency satisfies NEPA if it applies its categorical

exclusions and determines that neither an EA nor an EIS is required, *so long as the application of*

*the exclusions to the facts of the particular action is not arbitrary and capricious*."  *Bicycle*

*Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1446 n.5 (9th Cir. 1996) (*as amended* June 17,

1996) (emphasis added).

## C.    Healthy Forest Restoration Act ("HFRA")

HFRA "directs the [USFS] to take action to 'reduce wildfire risk' and 'enhance efforts to

protect watersheds and address threats to forest and rangeland health.'"  *WildWest Inst. v. Bull*,

547 F.3d 1162, 1165 (9th Cir. 2008) (quoting 16 U.S.C. § 6501(1), (3)).  "Specifically, the

[USFS] is required 'as soon as practicable' to implement an 'authorized hazardous fuel reduction

project' on federal land where 'the existence of an epidemic of disease or insects, or the presence

of such an epidemic on immediately adjacent land and the imminent risk it will spread, poses a

significant threat to an ecosystem component, or forest or rangeland resource.'"  *WildWest Inst.*,

547 F.3d at 1165 (quoting 16 U.S.C. § 6512(a)(4) (alterations omitted)).  HFRA requires NEPA

compliance.  *WildWest Inst.*, 547 F.3d at 1165 (citing 16 U.S.C. § 6514(a)).

### III.  DISCUSSION

Alliance generally claims that the USFS's failure to use the statutory definition of

wildland-urban interface violates HFRA and requires a remand for a supplemental NEPA

analysis.  *See* Alliance's Mem. ISO MSJ, pp. 18-28 (Dkt. 22-1).  Defendants disagree,[12] while

separately contesting Alliance's ability to challenge the Project in the first instance for lack of

---

[12]  The State of Idaho, State Board of Land Commissioners, and the Idaho Department of
Lands also collectively filed an *amicus curiae* brief, supporting Defendants' position in this
litigation.  *See generally* State of Idaho's *Amicus Curia* Brief, pp. 1-2 (Dkt. 30) ("[T]he State
supports the Defendants' position in this matter, due to the State's interest and goals in the
overall health of *all* forests.  The Good Neighbor Authority ("GNA") program and the [Project]
in particular, further those interests.") (emphasis in original).

**MEMORANDUM DECISION AND ORDER - 15**

standing and failure to exhaust administrative remedies.  *See* Defs.' Opp. to Alliance's MSJ and

Mem. ISO MSJ, pp. 7-13, 31-37 (Dkt. 28-1).  The Court addresses each argument in turn below.

## A.    Alliance Has Standing

Article III of the United States Constitution limits judicial power to deciding cases and

controversies.  This limitation, known as the standing doctrine, requires that a plaintiff have a

"personal stake in the outcome of the controversy . . . to warrant his invocation of federal-court

jurisdiction."  *Warth v. Seldin*, 442 U.S. 490, 490-99 (1975).  A plaintiff must establish that "he

is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be

actual and imminent, not conjectural and hypothetical; it must be fairly traceable to the

challenged action of the defendant; and it must be likely that a favorable judicial decision will

prevent or redress the injury."  *Jayne v. Sherman*, 706 F.3d 994, 999 (9th Cir. 2013).

To the extent Defendants' standing-related arguments are tethered to those claims

relating to the Access Amendments and/or the ESA, they do not apply to preclude Alliance's

Fourth and Fifth Claims for Relief.  *See, e.g.*, Defs.' Opp. to Alliance's MSJ and Mem. ISO MSJ,

pp. 7-10 (Dkt. 28-1).[13]  Suffice it to say, relevant to *this* Memorandum Decision and Order and

the claims addressed herein, environmental organization plaintiffs can assert the standing of its

---

[13]  This appears to be the case, despite Defendants later claiming that "the Court has *independent grounds* to dismiss Claims Four and Five for lack of subject matter jurisdiction." Defs.' Opp. to Alliance's MSJ and Mem. ISO of MSJ, p. 12 (Dkt. 28-1) (emphasis added); *see also infra* (discussing alleged "independent grounds" of (1) failure to exhaust administrative remedies, and (2) absence of major federal action).  To wit, Defendants' standing-related arguments focus on the First, Second, Third, and Sixth Claims for Relief in that such claims address the Access Amendments and/or the ESA.  *See, e.g.*, *id*. at pp. 8-9 ("Plaintiff fails to demonstrate that any alleged injury is 'actual and imminent' and not 'conjectural or hypothetical' with respect to its ESA, NEPA,NFMA, and HFRA claims *tied to the Access Amendments*. . . . Plaintiff's claims under the ESA (Claims Two and Three) should also be dismissed for failure to set forth sufficient facts to establish the injury-in-fact element of standing under that statute.") (emphasis in original).  Owing to the action's state of flux, these arguments are not addressed here.  *See supra*.  Similarly, where Defendants' ripeness-related arguments are also dependent on the Access Amendments, they too do not apply and are not addressed here.  *See id*. at pp. 10-12.

members.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("While generalized

harm to the forest or the environment will not alone support standing, if that harm in fact affects

the recreational or even the mere esthetic interests of the plaintiff, that will suffice.").  On that

score, Alliance's supporting declarations establish that is members frequently and extensively

utilize the areas surrounding the Project.  For example:

- "I use and enjoy the [IPNF], including the [Project] area.  More specifically, I own property near the Project area at Kalispell Bay,  I care about the Hanna Flats area because I recreate there regularly throughout the year, including bicycle riding, hiking, wildlife observing, and cross-county skiing.  I am opposed to implementation of the [Project] because we would lose a very valuable opportunity to enjoy the area, and this is also a corridor for wildlife.  I also am concerned that removing the trees will have an effect on the quality of our environment, and lake water quality as nutrients will be released that can travel to the lake via groundwater.  This can enhance lake eutrophication, a problem that is already starting to show in near-shore areas."  Boll Decl. ¶¶ 2-4 (Dkt. 22-2).

- "I use and enjoy the [IPNF], including the [Project] area.  More specifically, I own property near the Project area.  I care about this area because three generations of my family live or have lived on the Priest River for 41 years, which I believe will be impacted by this timber sale.  I am opposed to implementation of the [Project] for several reasons.  We have seen the devastation that large timber sales have ravaged on the Selkirk Priest River Basin which Hanna Flats is a part of.  Of particular interest to me and my family is stream sedimentation.  We can testify that we all have seen the quality of the Priest River degrade significantly. . . .  I was told by Glenn Rothrock of the IDEQ in 2007, "these changes are the results of the increasing water temperatures and sediment loading from the water in Priest Lake that feeds the Priest River," and that sediment loading at Priest Lake is impacted by the 30 plus impaired streams that feed into Priest Lake.  Some of these impaired streams will be further impacted by the [Project] if it goes through.  An already devastating problem will increase, perhaps beyond the tipping point if more stress is added into an already fragile environmental equation.  As Priest Lake warms and degrades, largely because of warm temperature water and sediment loading from the streams that feed it, I worry that the [Project] will increase the lack of shade over and increase sediment runoff in the streams and wet lands it encompasses, and further impair Priest Lake. . . .  I am also opposed to the implementation of the [Project] because of the logging that would take place, according to the Project plan, surrounding Old Growth Forest.  Retention of Old Growth Forest is of paramount importance.  Many endangered species in the area depend upon Old Growth Forest as habitat.  Circumnavigating old growth

**MEMORANDUM DECISION AND ORDER - 17**

by logging the surrounding areas within the proposed plan will negatively impact these old growth forest areas." Gardner Decl. ¶¶ 2-4 (Dkt. 22-3).

- "We use and enjoy the [IPNF], including the [Project] area. More specifically, we own property about 15 miles from the Project Area. This area offers abundant recreational activities such as cross-county ski trails, the historic Hanna Flats old growth forest trail, hiking, biking and horseback riding trails, and a gravel pit used as a local shooting range. As our young children are growing, we plan to continue taking advantage of this unique area to experience nature. We have enjoyed the wild beauty and peacefulness of this place. We are opposed to the implementation of the [Project] because we also live in the middle of [USFS] managed land, and over the last two years, the [USFS] has directed logging near our home. It is some of the worst logging we have seen – very few trees were left and of those left, some have fallen in wind storms and others killed by the 'controlled burning' of the [USFS]. This has been very devastating to the once beautiful forest surrounding us and along our road. We would hate to see this happen to the beautiful Hanna Flats area which we have enjoyed so much." Meisners' Decl. ¶¶ 2-4 (Dkt. 22-4).

- ""I use and enjoy the [IPNF], including the [Project] area. More specifically, I own property near the Project area. Hanna Flats is a favorite berry picking, snowshoe/XC skiing, mushrooming, and arboreal lichen collection area for myself and others who reside in this area. . . . I will still plan to pick berries, forage for mushrooms, and generally recreate in the project area year-round moving forward (2020, 2021 and beyond), unless timber harvest activities create noisy or unsafe conditions. Specifically, I berry pick in this area in July, mushroom in the fall, hike and bike when the area is snow-free, and snowshoe or Nordic ski when the snow conditions are conducive. I am opposed to implementation of the [Project] because the 'forest restoration treatments' proposed there are, in most cases, just clear-cuts with fancier, more publicly palatable names. As a certified professional wetland scientist with more than 30 years of field experience, it is clear that the ecosystem services, or functions, that these intact forests perform ecologically, are in no way equivalent to that of a clear cut, or a clear cut with a few standing seed or 'shelter' trees. . . . Projects like the [Project] will only further increase the amount of exposed soils, which will warm faster than their forested counterparts, and will warm precipitation and groundwater flowing through them on the way to the lake." Moody Decl. ¶¶ 2-4 (Dkt. 22-5).

- "I use and enjoy the [IPNF], including the [Project] area. More specifically, I own property near the Project area, and live on this property. Ever since moving to this beautiful place I have mountain biked and hiked the roads and trails surrounding our home on [USFS] managed lands, and plan to continue doing so. I have also spent countless hours cleaning up trash and debris in the Project area. I care deeply about what happens in this forest. . . . Priest Lake and the surrounding forests are a rare gem, and I'm saddened by the direction I see the [USFS] heading with clear cutting, seed tree cuts and shelterwood cuts. I was

**MEMORANDUM DECISION AND ORDER - 18**

horrified when I learned the [Project] surrounds our property and that this is a collaboration with the state of Idaho . . . .  The proposed plan is a direct threat to the natural beauty of areas that have been somewhat untouched for many years, and the destruction of potential recruitment for old growth forests, as well as our view and road we use. . . .  I am also opposed to implementation of the [Project] because it will open more roads and access to areas where grizzly bear, lynx, elk, moose, eagle, and other wild animals live and need protection.  It could also adversely affect the water quality.  It will destroy the beauty of these mature, diverse forests where many people come to recreate."  Westbrook Decl. ¶¶ 2-4 (Dkt. 22-6).

These individuals aver that the Project will cause aesthetic, recreational, scientific, and spiritual injury across the Hanna Flats and surrounding areas.  Such statements support organizational standing.  *See Cottonwood Envtl. L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1081 (9th Cir. 2015) ("[T]hese declarations sufficiently establish "a geographic nexus between the individual asserting the claim and the location suffering an environmental impact.").  With all this in mind, the Court is persuaded that there is a sufficient basis for standing as presented in the current record.

## B.      Alliance Has Sufficiently Exhausted Its Administrative Remedies

The APA requires that plaintiffs exhaust their administrative remedies before bringing an issue to federal court.  *See Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 965 (9th Cir. 2006) (purpose of public comment period is to ensure agency is given opportunity to resolve concerns).  In order to exhaust administrative remedies, claims raised during the administrative process must be "so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same claims now raised in federal court." *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 846-47 (9th Cir. 2013); *see also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) ("Persons challenging an agency's compliance with NEPA must structure their participation so that it alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful

**MEMORANDUM DECISION AND ORDER - 19**

consideration.") (internal quotation marks and citation omitted).  It is thus premature and

inappropriate for a federal court to review a claim that was not first presented to the reviewing

agency.

Defendants argue that Alliance's Fourth Claim for Relief – that the USFS has not

established that the Project is in a wildland-urban interface as defined under HFRA – should be

dismissed "because [Alliance] did not raise it during the administrative process."  Defs.' Opp. to

Alliance's MSJ and Mem. ISO MSJ, p. 12 (Dkt. 28-1).  Defendants contend that, while Alliance

"submitted voluminous comments on the scoping notice, . . . none of these comments was

remotely similar to Claim Four, which asserts that the [USFS] has not shown that the Project is

located in a wildland-urban interface ("WUI") and that the [USFS] cannot rely on the WUI

identified in the Bonner County Wildfire Protection Plan."  *Id*. at p. 13 (citing AR 15218-322,

23039-43).  The Court disagrees.

Setting aside any possible issue associated with *how* the administrative review process is

to take place in a setting involving the applicability of a categorical exclusion under NEPA,[14] the

undersigned is satisfied that Alliance sufficiently alerted the USFS of its concern about how the

wildland-urban interface was delineated for the Project regardless.  Indeed, within its comments

on the Scoping Notice, Alliance states:

> The forest plan Glossary definition of WUI under (A) has allowed entities other
> than the general public to set WUI boundaries outside of NEPA and NFMA
> processes, and under (B) defines it so vaguely as to expand the delineation of the
> WUI greatly – again outside NFMA and NEPA processes.

---

[14]  On this point, Alliance suggests that, "[a]lthough the [USFS] requires an
administrative objection process for projects analyzed in an EA (with a decision documented in a
Decision Notice) or EIS (with a decision documented in a Record of Decision), there is no such
requirement for projects exempted from NEPA analysis with a categorical exclusion."
Alliance's Opp. to Defs.' MSJ and Reply ISO MSJ, p. 29 (Dkt. 34).  The Court stakes no ground
on this discrete issue except to note that Alliance's argument is somewhat undercut by the fact
that the Scoping Notice circulated for public comment indicated the possible utilization of the
categorical exclusion.  *See supra*.  In short, an opportunity existed to put the USFS on notice.

**MEMORANDUM DECISION AND ORDER - 20**

AR 15267.  This is enough to put the USFS on notice of the issue (while belying any suggestion

that "none of [Alliance's] comments was "remotely similar to Claim Four" (see *supra*)).  *See*

*Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002) (claimants bringing

administrative appeals may alert decision-maker to problem "in general terms, rather than using

precise legal formulations" and "there is no bright-line standard as to when this requirement has

been met and we must consider exhaustion arguments on a case-by-case basis") (citing *Native*

*Ecosystems Council v. Dombeck*, 304 F.3d 886, 900 (9th Cir. 2002)).[15]

**C.     By Not Using the Statutory Definition of Wildland-Urban Interface, the USFS Violated HFRA, Thus Rendering Its Use of the Categorical Exclusion Unlawful**

The USFS categorically excluded the Project from analysis in an EA or EIS under 16

U.S.C. §§ 6591b(a)(1),(2).  *See* AR 14451-52, 27366.  The categorical exclusion requires, in

part, a project either "in the wildland-urban interface" or "Condition Classes 2 or 3 in Fire

Regime Groups I, II, or III, outside the wildland-urban interface."  *Id*. at § 6591b(c)(2).  The

USFS's analysis for the Project states that "the entire project area is in the wildland-urban

interface . . . ."  AR 14452, 27366.[16]

HFRA defines a "wildland-urban interface" as:

(A)     an area within or adjacent to an *at-risk community* that is identified in recommendations to the Secretary in a *community wildfire protection plan*; or

(B)     in the case of any area for which a community wildfire protection plan is not in effect –

---

[15]  As another "independent grounds to dismiss," Defendants argue that Alliance's Fifth Claim for Relief should be dismissed because the Bonner County Wildfire Plan(s) is/are not "major federal actions" that require NEPA analyses.  *See* Defs.' Opp. to Alliance's MSJ and Mem. ISO MSJ, pp. 13-17 (Dkt. 28-1).  This argument is addressed later in the context of the parties' more substantive arguments vis à vis Alliance's Fourth and Fifth Claims for Relief.

[16]  The USFS's analysis for the Project does not claim that the Project is located in an area with "Condition Classes 2 or 3 in Fire Regime Groups I, II, or III."  *See* AR 14452, 27366.

**MEMORANDUM DECISION AND ORDER - 21**

(i)     an area extending ½-mile from the boundary of an at-risk community;

(ii)    an area within 1 ½ miles of the boundary of an at-risk community, including any land that –

(I)     has a sustained slope that creates the potential for wildfire behavior endangering the at-risk community;

(II)    has a geographic feature that aids in creating an effective fire break, such as a road or ridge top; or

(III)   is in condition class 3, as documented by the Secretary in the project-specific environmental analysis; and

(iii)   an area that is adjacent to an evacuation route for an at-risk community that the Secretary determines, in cooperation with the at-risk community, requires hazardous fuel reduction to provide safer evacuation from the at-risk community.

16 U.S.C. § 6511(16) (emphasis added).  Bonner County, where the entire footprint of the Project is located, has a community wildfire protection plan (such that 16 U.S.C. § 6511(16)(A) applies) – Bonner County's 2012 and 2016 Wildfire Plans.  *See* AR 9547-84 (2012 version), 28924-76 (2016 version).  An "at-risk community" is further defined as an area:

(A)     that is comprised of –

(i)     an *interface community* as defined in the notice entitled "Wildland Urban Interface Communities Within the Vicinity of Federal Lands That Are at High Risk from Wildfire" issued by the Secretary of Agriculture and the Secretary of the Interior . . .;[17] or

---

[17]   The "Wildland Urban Interface Communities Within the Vicinity of Federal Lands That Are at High Risk from Wildfire" identifies three types of communities – interface, intermix, and occluded – that qualify as "urban wildland interface" communities" and defines each as:

**Category 1.  Interface Community**

The Interface Community exists where structures directly abut wildland fuels. There is a clear line of demarcation between residential, business, and public structures and wildland fuels.  Wildland fuels do not generally continue into the developed area.  The development density for an interface community is usually 3 or more structures per acre, with shared municipal services.  Fire protection is generally provided by a local government fire department with the responsibility to

(ii)     a *group of homes* and other structures with basic infrastructure and services (such as utilities and collectively maintained transportation routes) within or adjacent to Federal land;

(B)     in which conditions are conducive to a large-scale wildland fire disturbance event; and

(C)     for which a significant threat to human life or property exists as a result of a wildland fire disturbance event.

16 U.S.C. § 6511(1) (emphasis added).

Here, the Project's Scoping Notice states in no uncertain terms that the Project is located within a wildland-urban interface.  *See* AR 14432 ("The [Project] area lies entirely within the wildland-urban interface defined by Bonner County."); AR 14452 ("[T]he entire project area is in the wildland-urban interface[.]").  However, the Scoping Notice does not define wildland-

---

protect the structure from both an interior fire and an advancing wildland fire.  An alternative definition of the interface community emphasizes a population density of 250 or more people per square mile.

**Category 2.  Intermix Community**

The Intermix Community exists where structures are scattered throughout a wildland area.  There is no clear line of demarcation; wildland fuels are continuous outside of and within the developed area.  The development density in the intermix ranges from structures very close together to one structure per 40 acres.  Fire protection districts funded by various taxing authorities normally provide life and property fire protection and may also have wildland fire protection responsibilities.  An alternative definition of intermix community emphasizes a population density of between 28-250 people per square mile.

**Category 3.  Occluded Community**

The Occluded Community generally exists in a situation, often within a city, where structures abut an island of wildland fuels (e.g., park or open space).  There is a clear line of demarcation between structures and wildland fuels.  The development density for an occluded community is usually similar to those found in the interface community, but the occluded area is usually less than 1,000 acres in size.  Fire protection is normally provided by local government fire departments.

66 Fed. Reg. 751, 753 (Jan. 4, 2001).

**MEMORANDUM DECISION AND ORDER - 23**

urban interface or contain a map of the wildland-urban interface within which the Project is said

to be located.  *See* AR 14414-63.  Similarly, the Decision Memo says that the wildland-urban

interface surrounds the Project.  *See* AR 27366 ("The entire project is in the wildland-urban

interface.  See the 'Fire, Fuels, and Air Quality' resources report filed on the project webpage . . .

."").  But it too has neither a definition nor a map of the purported wildland-urban interface in

relation to the Project.  *See* AR 27361-412).  And, although the "Fire, Fuels, and Air Quality

Report" (mentioned in the Decision Memo) notes that "[t]his area is in wildland-urban interface

and areas of intermixed ownership," it also does not include a supporting explanation for that

statement, or a definition or map of the applicable wildland-urban interface.  *See* AR 25343.

      To the extent the Scoping Notice and Decision Memo can be read to suggest that their

references to the Project being within a wildland-urban interface derive from Bonner County's

2012 or 2016 Wildfire Plans (neither the Scoping Notice nor the Decision make clear which, if

any, Wildfire Plan was utilized), those Plans are only marginally more helpful.

      For example, the 2012 Wildfire Plan notes that a wildland-urban interface "includes any

area within two miles of dwellings used for human habitation and/or infrastructure that serves

these points of habitation."  AR 9572.[18]  But there is, again, no map of the wildland-urban

interface.  *See* AR 9547-84.  More critically, there is no way of knowing whether the Project

would have fallen within the wildland-urban interface as defined by the 2012 Wildfire Plan

because it is unclear whether all Project units are within two miles of human habitations.  *See* AR

9572.  There is simply nothing within the 2012 Wildfire Plan that applies the provided definition

of wildland-urban interface to objectively discernable metrics within Bonner County to

substantiate the claim that the Project exists within the wildland-urban interface's boundaries.

---

[18]  It also cites to its "Appendix A for a complete definition of Wildland-Urban
Interface," but the 2012 Wildfire Plan contains no such Appendix A.  AR 9547-84.

**MEMORANDUM DECISION AND ORDER - 24**

Additionally, the 2016 Wildfire Plan expands the definition of wildland-urban interface to "an area where developed lands interact with undeveloped lands and includes the infrastructure and natural resources communities rely on for existence.  Location:  It is found in remote scattered development areas to highly developed urban areas and everywhere in between."  AR 28953.  The included map reflects this broadly-encompassing definition, with the resulting claim that nearly all of Bonner County is located in the wildland-urban interface.  *See* AR 28955.  Defendants would contend that the Project fits inside this broad definition of wildland-urban interface; the relevant question, however, is whether it should be, under the requirements of HFRA.

It is not enough to simply declare that the Project is within a wildland-urban interface, especially when the intended purpose of doing so – as in this case – is to avoid the requirement of preparing an EA (or EIS) as would otherwise be required under NEPA. There must be something else that connects the dots and thereby would support Defendants' position that the categorical exclusion under HRFA applies to the Project.  Perhaps the foundation for claiming the categorical exclusion could be have been constructed, but it was not.  The Scoping Notice and the Decision Memo – the two documents that expressly align the Project's incorporation within the wildland-urban interface with a categorical exclusion – do not define the wildland-urban interface or identify its contours so as to prove its existence atop the Project.  *See supra*. The same criticism can be levelled against Bonner County's Wildfire Plans (from which the Scoping Notice and the Decision Memo presumably draw upon to assert that the Project is within the wildland-urban interface), in that neither of the Wildfire Plans' wildland-urban interface demarcations is capable of verification in any meaningful way – *regardless* of which Wildfire Plan the USFS used for the project.  *See id*.  In short, simply saying that the Project is within the wildland-urban interface, without more, does not make it so.

**MEMORANDUM DECISION AND ORDER - 25**

Even if one could reverse-engineer from these materials the definition used by the USFS to conclude that the Project is within the wildland-urban interface, it would still fail HFRA's definition for the same.  That is, whatever definition (uncertain or lacking entirely) of wildland-urban interface the USFS applied to the Project, it did not clearly take into account at-risk communities as required by HFRA – uniquely defined therein as either (1) an interface community (with three or more structures per acre or a population density of 250 people per square mile), or (2) a group of homes/other structures with basic infrastructure and services within or adjacent to Federal land.  *See supra* (citing 16 U.S.C. § 6511(1), (16)).  To state – as Defendants do – that a community wildfire protection plan (like either Bonner County's 2012 or 2016 Wildfire Plans) by itself suffices to establish a wildland-urban interface for the purpose of invoking a categorical exclusion, ignores these realities.  *See* Defs.' Opp. to Alliance's MSJ and Mem. ISO MSJ, pp. 32-33 (Dkt. 28-1) ("Here, the [USFS] was able to rely on a community wildfire protection plan produced as a result of years of planning and collaboration at the local level. . . .  HFRA expressly defines the term [wildland-urban interface] to incorporate the prevailing community wildfire protection plan.  In accordance with HFRA, the [USFS] used the [wildland-urban interface] identified in the Bonner County Wildfire Protection Plan when the agency developed and authorized the Project under HFRA's insect and disease infestation categorical exclusion.").[19]   The Court must give meaning to all the words used in defining

---

[19]   In further support of this position, Defendants point to a statement made by Alliance elsewhere that "the HFRA statutory language is clear that if there is a county plan, then the definition [of wildland-urban interface] in the county plan controls."  Defs.' Opp. to Alliance's MSJ and Mem. ISO MSJ, p. 33 (Dkt. 28-1) (citing *Native Ecosystems Council v. Marten*, No. 18-35653 (9th Cir. Oct. 10, 2018) (Dkt. 12)).  However, that statement (made in an appellate brief) related to a case that was eventually remanded to allow the USFS to re-evaluate the applicable wildland-urban interface.  *See Native Ecosystems Council v. Marten*, 789 Fed. Appx 583, 584 (9th Cir. 2020) ("The [USFS] has acknowledged that it erred in calculating the wildland-urban interface for the project area. . . .  We grant the government's request for a voluntary remand to all the [USFS] to undertake the necessary reevaluation.").  While this has

wildland-urban interface and thus cannot read out HFRA's explicit incorporation of at-risk communities in the definition of wildland-urban interface, or ignore HFRA's simultaneous definition of at-risk communities themselves.[20]

To be clear, this is not to say that community wildfire protection plans are not important and cannot be relied upon when assessing wildland-urban interfaces – just the opposite; after all, they too are specifically integrated into the definition of a wildland-urban interface. *See supra* (citing 16 U.S.C. § 6511(16)).  But a wildfire protection plan's utility presumes its synergy with HFRA such that, where it does not coincide with HFRA (e.g., when it defines wildland-urban interface differently than HFRA does), it cannot then operate as justification for a categorical exclusion under HFRA.  Otherwise, a local county could designate their entire county as wildland-urban interface in a community wildfire protection plan, and then use that designation as the basis to categorically exclude logging projects throughout the county without the protections of NEPA.  Recognizing the importance of the public's participation in federal actions that affect the environment, this is a problem. *See, e.g.*, *California v. Block*, 690 F.2d 753, 770-

---

the Court's attention on the issue, whatever ground Defendants gain in noting a non-contextual statement made by Alliance in an appellate brief recedes when looking at how the case has since unfolded.

[20] Defendants argue that there is no need to detail at-risk communities ("groups of homes, the number of structures per acre, population density, or anything else [Alliance] claims is missing") because the Federal Register notice "explicitly identifies more than a dozen communities in Bonner County as interface communities."  Defs.' Opp. to Alliance's MSJ and Mem. ISO MSJ, p. 35 (Dkt. 28-1) (citing 66 Fed. Reg. 751, 764 (Jan. 4, 2001)).  But it is unclear whether these "interface communities" satisfy HFRA's definition of at-risk communities or whether they are actually within or adjacent to the Project area. *See* 16 U.S.C. § 6511 (1), (16); *see also* Alliance's Opp. to Defs.' MSJ and Reply ISO MSJ, p. 20 (Dkt. 34) (The only specific information that [Alliance] could find in the record was a statement in the Project Biological Assessment that '[t]he project is located approximately 5.5 miles northwest of Coolin, Idaho and approximately 3 miles southeast of Nordman, Idaho . . . .'  A project located 3-5.5 miles from the nearest town is not reasonably construed as within or adjacent to an at-risk community.  While there are scattered homes in the area, the density of structures and people appears to be far too low to constitute an 'at-risk' community.'" (citing AR 29356)).

**MEMORANDUM DECISION AND ORDER - 27**

71 (9th Cir. 1982) ("NEPA's public comment procedures are at the heart of the NEPA review process . . . .  This reflects the paramount Congressional desire to internalize opposing viewpoints into the decision-making process to ensure that an agency is cognizant of all the environmental trade-offs that are implicit in a decision."); 40 C.F.R. § 1500.1(b) ("NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken.  The information must be of high quality.  Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA").  The sideboards provided within HFRA, if followed, harmonize these and other relevant considerations.

In sum, it is unclear how the wildland-urban interface was defined here so that it could be confirmed that the Project sits within such an area and therefore qualifies for a categorical exclusion.  *See Native Ecosystems Council*, 418 F.3d at 963 ("If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable.  It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive.").  At the very least, the statutory definition of wildland-urban interface was not used; as a result, the USFS violated HFRA, rendering its use of the categorical exclusion unlawful.  Alliance's Motion for Summary Judgment (as to the Fourth Claim for Relief) is granted in this respect.[21]

_____

[21]  As to Alliance's Fifth Claim for Relief, it cannot be said that Bonner County's Wildfire Plans represent "federal actions" that require an EA or EIS.  *See* Alliance's Mem. ISO MSJ, pp. 21-24 (Dkt. 22-1).  It may be true that the USFS was a member on the Steering Committee for both the 2012 and 2016 Wildfire Plans (AR 9549 (2012 Wildfire Plan), 28929 (2016 Wildfire Plan)), but the record does not support the conclusion that the USFS prepared or approved either Wildfire Plan.  *See* 40 C.F.R. § 1508.18(b)(2) (Federal actions subject to NEPA include "[a]doption of formal plans, such as official documents *prepared or approved by federal agencies* which guide or prescribe alternative uses of Federal resources, upon which future

**D.**     **Remand Without Vacatur Is Proper to Allow the USFS to Reevaluate the Project-Area Wildland-Urban Interface**

"Vacatur is the presumptive remedy when a court finds an agency's decision is unlawful under the [APA]." *AquAlliance v. U.S. Bureau of Reclamation*, 312 F. Supp. 3d 878, 880 (E.D. Cal. 2018 (citing 5 U.S.C. § 706(2)(A)).  Despite this, vacatur is not appropriate in every case.  "When equity demands, [the decision] can be left in place while the agency follows the necessary procedures to correct its action." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995).

It is rare to decline vacatur but permissible if the decision meets the two-factor test laid out in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).  "The *Allied-Signal* factors are:  (1) the seriousness of an agency's errors, and (2) the disruptive consequences that would result from vacatur." *AquAlliance*, 312 F. Supp. 3d at 881.  "Put differently, 'courts may decline to vacate agency decisions when vacatur would cause serious and irremediable harms that significantly outweigh the magnitude of the agency error.'" *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015) (quoting *League of Wilderness Defs./Blue Mts. Biodiversity Project v. United States Forest Serv.*, 2012 WL 13042847, *6 (D. Or. 2012)).

Here, the seriousness of the USFG's errors is unknown – it is even possible that, in fact, the Project *is* within the wildland-urban interface (as that term is used in HFRA) and thereby

---

agency actions will be based.") (emphasis added); *see also* 16 U.S.C. § 6513(c)(1) ("Federal agency involvement in developing a community wildfire protection plan, shall not be considered a Federal agency action . . . .").  Moreover, any claim that "tiering" to a Bonner County Wildfire Plan requires a NEPA analysis gets circular when keeping in mind the (legitimate) categorical exclusion's exemption from NEPA analysis.  *See* Alliance's Mem. ISO MSJ, pp. 24-28 (Dkt. 22-1).  And, where such relief is already provided for here under HFRA, that circularity cannot be reconciled.  For these reasons, on this record, Alliance's Motion for Summary Judgment (as to the Fifth Claim for Relief) is denied in this limited respect, whereas Defendants' Cross-Motion for Summary Judgment (as to the Fifth Claim for Relief) is granted in this limited respect.

**MEMORANDUM DECISION AND ORDER - 29**

appropriately categorically excluded from NEPA analysis.  This circumstance weighs heavily against vacatur.  But the record remains unclear on this lynchpin point – the Scoping Notice and the Decision Memo do not define the wildland-urban interface and no map of its impression in relation to the Project is supplied; at the same time, the Bonner County Wildfire Plans' differing definitions of wildland-urban interface depart from HFRA while proving incapable of corroboration in any Project-specific review.  *See supra*.  All this is to say that nobody can accurately and definitively claim that the Project fits within the wildland-urban interface and represents a categorical exclusion.

Because this uncertainty is capable of being resolved, the Court remands the case and will require that the USFS revisit its claim that the entire Project area is within the wildland-urban interface.  To this end, the USFS shall issue a supplemental Decision Memo that clearly: (1) states how the wildland-urban interface is defined; (2) applies the wildland-urban interface (using the supplied definition) to a map that concurrently and definitively depicts the Project area; and (3) explains how the Project area falls within the wildland-urban interface under HFRA.  The point of this exercise is to allow whatever conclusion is reached to be replicated, tested, and confirmed.  The Project is suspended until such review is complete and supplemental Decision Memo issued, with a 30-day Notice preceding any beginning or resumption of Project-related activities.

## IV. <u>ORDER</u>

Based on the foregoing, IT IS HEREBY ORDERED that:

1.      Plaintiff's Motion for Summary Judgment (Dkt. 22 & 25) is GRANTED, in part, and DENIED, in part, as follows:

      a.      Plaintiff's Motion for Summary Judgment is GRANTED as to Plaintiff's Fourth Claim for Relief.

**MEMORANDUM DECISION AND ORDER - 30**

   b.  Plaintiff's Motion for Summary Judgment is DENIED as to Plaintiff's Fifth Claim for Relief.

   c.  Plaintiff's Motion for Summary Judgment is DENIED, without prejudice, as to Plaintiff's First, Second, Third, and Sixth Claims for Relief.

  2.  Defendants' Cross-Motion for Summary Judgment (Dkt. 28) is GRANTED, in part, and DENIED, in part, as follows:

   a.  Defendants' Cross-Motion for Summary Judgment is GRANTED as to Plaintiffs' Fifth Claim for Relief.

   b.  Defendants' Cross-Motion for Summary Judgment is DENIED as to Plaintiffs' Fourth Claim for Relief.

   c.  Defendants' Cross-Motion for Summary Judgment is DENIED, without prejudice, as to Plaintiff's First, Second, Third, and Sixth Claims for Relief.

  3.  Plaintiff's Motion to Strike Defendants' Dkt. 54 Filing (Dkt. 55) is DENIED, without prejudice; and

  4.  Defendants' Motion to Dismiss (Dkt. 60) is DENIED, without prejudice.

  5.  The action is remanded.  The USFS shall revisit its claim that the entire Project area is within the wildland-urban interface.  To this end, the USFS shall issue a supplemental Decision Memo that clearly:  (1) states how the wildland-urban interface is defined; (2) applies the wildland-urban interface (using the supplied definition) to a map that concurrently and definitively depicts the Project area; and (3) explains how the Project area falls within the wildland-urban interface under HFRA.  The Project is suspended until such review is complete

///

///

///

**MEMORANDUM DECISION AND ORDER - 31**

and supplemental Decision Memo issued, with a 30-day Notice preceding any beginning or resumption of Project-related implementation activities.

DATED: April 27, 2021

_____

Ronald E. Bush
Chief U.S. Magistrate Judge